**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD WAYNE WRIGHT, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:05-CV-439-WHA-CSC |
| | ) | |
| SYLVESTER NETTLES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SPECIAL REPORT AND ANSWER**

COME NOW, Defendants TAHIR SIDDIQ, MD ("Dr. Siddiq"), KATHERINE TAYLOR, LPN ("Taylor"), SAMUEL RAYAPATI, MD ("Dr. Rayapati"), NETTIE BURKS, LPN ("Burks"), CELESTE HUNTER, LPN ("Hunter") and PRISON HEALTH SERVICES, INC. ("PHS," collectively with Dr. Siddiq, Taylor, Dr. Rayapati, Burks and Hunter, the "Medical Defendants"), pursuant to this Court's Order dated August 4, 2005, requiring Medical Defendants to provide a Special Report and Answer, and submit the following Special Report addressing the allegations asserted by Plaintiff RICHARD WAYNE WRIGHT, SR. ("Plaintiff"):

**I.    INITIAL DISCLOSURES**[1]

Medical Defendants make the following initial disclosures as required by this Court's August 4, 2005, Order for Special Report:

A.    The sworn statement of Dr. Tahir Siddiq;[2]

---

[1]    This initial disclosures section is responsive to this Court's requirement to obtain the "sworn statements of all persons having knowledge of the subject matter of the complaint" as required by this Court's August 4, 2005, Order for Special Report and Answer.  (Order at ¶ 2).  The sworn statements attached hereto include any and all present employees of PHS who have knowledge pertinent and/or material to Plaintiff's allegations in this case.

[2]    A true and correct copy of Dr. Tahir Siddiq's affidavit ("Siddiq Affidavit") is attached hereto as **Exhibit A** and incorporated herein by reference.

84637.1

B.    The sworn statement of Katherine Taylor;[3]

C.    The sworn statement of Dale Robinson ("Robinson");[4]

D.    The sworn statement of Dr. Samuel Rayapati;[5]

E.    The sworn statement of Nettie Burks;[6]

F.    The sworn statement Celeste Hunter;[7]

G.    The sworn statement of Linda Floyd ("Floyd");[8] and

H.    The sworn statement of Dorothy Stanford ("Stanford") with Plaintiff's medical records attached thereto.[9]

## II.    NARRATIVE STATEMENT OF UNDISPUTED FACTS

### A.    SUMMARY OF AMENDED COMPLAINT & CURRENT ALLEGATIONS

On or about May 11, 2005, Plaintiff, an inmate currently incarcerated at Ventress Correctional Facility ("Ventress"), filed a Complaint pursuant to 42 U.S.C. § 1983, which was subsequently amended on July 28, 2005, alleging that the more than fifty (50) Defendants[10]

---

[3]    A true and correct copy of Katherine Taylor's affidavit ("Taylor Affidavit") is attached hereto as **Exhibit B** and incorporated herein by reference.

[4]    A true and correct copy of Dale Robinson's affidavit ("Robinson Affidavit") is attached hereto as **Exhibit C** and incorporated herein by reference.

[5]    A true and correct copy of Dr. Samuel Rayapati's affidavit ("Rayapati Affidavit") is attached hereto as **Exhibit D** and incorporated herein by reference.

[6]    A true and correct copy of Nettie Burks' affidavit ("Burks Affidavit") is attached hereto as **Exhibit E** and incorporated herein by reference.

[7]    A true and correct copy of Celeste Hunter's affidavit ("Hunter Affidavit") is attached hereto as **Exhibit F** and incorporated herein by reference.

[8]    A true and correct copy of Linda Floyd's affidavit ("Floyd Affidavit") is attached hereto as **Exhibit G** and incorporated herein by reference.

[9]    A true and correct copy of Dorothy Stanford's affidavit ("Stanford Affidavit") is attached hereto as **Exhibit H** and incorporated herein by reference.

[10]    In his Amended Complaint, Plaintiff identifies the following individuals as Defendants in this case: Tahir Siddiq M.D., Williams Sanders, Sherry Seals, Selvester Nettles, Larry Ligon, Paul Phillips, Walton Solomon, Mose Foster, Dr. Hammer, Alberta Williams, Gwendolyn Babers, Officer Rudolph (B/F), Prison Health Services (P.H.S.), Brenda Austin, Robert Washington, Elizabeth Laseter, Anthony Jackson, Melvin Austin, Mrs. Biven-tutt, Sgt. Davis, Mrs. Gormon, Dr. Smith, Nurse Taylor, Alex Rudolph, Keith Armagost, Harvey Ruffin, Sgt. Specks, Officer Ellis, Officer Franklin, Charles Blackledge, Eric Williams, Timothy Holmes, Brian Hampton, Johnny Bailey,

named in the above-styled action violated his constitutional rights.  (See Complaint; Amended Complaint).  As a result, the Court required Medical Defendants to provide this Special Report and Answer to Plaintiff's Amended Complaint on or before November 14, 2005.  (See Order dated Aug. 4, 2005; see also Order dated Aug. 31, 2005).

### 1.    CURRENT ALLEGATIONS

In his Amended Complaint, Plaintiff alleges an array of claims against Defendants, including: (1) intercepting Plaintiff's outgoing mail (See Amended Complaint at pp. 1-2 of 29); (2) requiring Plaintiff to involuntarily take psychotropic medications (Id. at pp. 3-5 of 29); (3) falsely accusing Plaintiff of violating an administrative rule against indecent exposure (Id. at pp. 5-7 of 29); (4) falsely altering the crimes for which Plaintiff is incarcerated, thereby hindering his attempts to be paroled (Id. at pp. 7-9 of 29); (5) raising Plaintiff's security status from minimum to maximum (Id. at pp. 9-10 of 29); (6) falsifying statements made by Plaintiff (Id. at pp. 11-12 of 29); (7) harassing Plaintiff (Id. at pp. 13-16 of 29); (8) disregarding Plaintiff's complaints, causing him to develop dementia (Id. at 17-18 of 29); (9) altering Plaintiff's shaving profile resulting in threats from Alabama Department of Corrections' ("ADOC") officers (Id. at pp. 18-22 of 29); (10) disregarding Plaintiff's complaints concerning tuberculosis ("TB") skin tests (Id. 22-26 of 29); (11) denying Plaintiff medical treatment on specified dates (Id. at p. 24 of 29); (12) failing to check Plaintiff's blood-sugar level (Id. at p. 24 of 29); and (13) disregarding Plaintiff's complaints of sores on his legs, hands, back, head and face (Id. at p. 25 of 29).  These claims arise out of Plaintiff's incarceration at Ventress and his prior incarceration at Bullock Correctional Facility ("Bullock").

---

Micheal Strickland, Janet Hicks, Mark Bruton, Sharon Holland, Camella Cargle, Nurse Hunter, Dr. Rayapati (M.D.), Mr. Jenkins, Kenneth Cargle, Veronica Stringer, John Dowling, M.L. Monk (COS II), N. Burks (HAS), Carolyn Longmire, Lt. Taylor, Officer Pullum (B/M)(COI), William C. Segrest and Carolyn Miles-Pruitt (collectively, the "Defendants").

### 2. ALLEGATIONS INAPPLICABLE TO MEDICAL DEFENDANTS

PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress and Bullock are not responsible for actions taken by ADOC's officers and/or other personnel. (See Burks Affidavit at ¶ 19; Robinson Affidavit at ¶ 12). Particularly, PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress and Bullock do not engage in the following activities: processing and/or reviewing any inmate's outgoing mail, applying and enforcing the ADOC's administrative rules, making any decisions regarding an inmate's eligibility for parole and/or changing in any way any inmate's security status from minimum to maximum. (Id.).

Likewise, PHS's physicians, nurse practitioners, nurses and other medical personnel cannot require an inmate to involuntarily take psychotropic medications. (See Burks Affidavit at ¶ 5). A psychotropic drug is one that alters brain function, resulting in temporary changes in perception, mood, consciousness or behavior. (See Burks Affidavit at ¶ 4). These drugs are also used to treat neurological and psychological illnesses. (Id.). Mental Health Management ("MHM") is a private health care provider retained by the ADOC to provide mental health and/or psychiatric care for inmates incarcerated in state prisons in Alabama. (Id. at ¶ 5). MHM is not a subcontractor of PHS and PHS has no authority to direct and/or control any mental health and/or psychiatric care provided by MHM. (Id.). MHM provides mental health and/or psychiatric care to inmates at Ventress five (5) days a week, eight (8) hours a day. (Id.). As a general rule, MHM alone is responsible for ordering and prescribing any and all psychotropic medications for inmates with mental health and/or psychiatric conditions. (Id.).

There is one limited exception to this rule. (Id.). PHS physicians may prescribe and provide inmates with the psychotropic drug Elavil, which is often prescribed for various medical

conditions such as neuropathy. (Id.). No PHS physician or other PHS medical personnel has ever been prescribed Elavil or any other psychotropic drug for Plaintiff. (Id.). PHS is not responsible in any way for providing inmates incarcerated at Ventress, including Plaintiff, with any psychiatric care of any kind while MHM is present. (Id. at ¶ 6). PHS is not responsible in any for ordering and/or prescribing any psychotropic medications for inmates at Ventress, except as noted above. (Id.). PHS's only role in providing psychiatric services at Ventress is its administration of prescribed psychotropic medications through the pill call process. (Id.). PHS physically administers and/or provides all prescribed medications to all inmates at Ventress through this pill call process. (Id.). Pill call is the process by which inmates at Ventress receive prescribed medication. (Id.). Pill call is conducted four (4) times per day at 2:30 a.m., 9:15 a.m., 3:00 p.m. and 9:00 p.m. (Id.). When inmates are summoned to pill call, each inmate with prescription medication appears before a pill call window located in the Health Care Unit and a member of the PHS medical staff hands each inmate his prescribed medications. (Id.). The medications administered and/or provided by PHS during pill call include any psychotropic medications prescribed by MHM for inmates at Ventress that can be taken in pill form. (Id.). PHS nurses and other medical personnel may not administer any other form of psychotropic drugs, such as injectable psychotropic medications, which are administered directly by MHM personnel when they are present. (Id.).

The PHS medical staff generates a Medication Administration Record ("MAR") for each inmate who receives medication through the pill call process. (Id. at ¶ 7). MARs document the specific types of medication inmates receive on a day-to-day basis as well as the exact dates when an inmate receives any prescribed medications. (Id.). MARs are generated for each month in which an inmate receives prescribed medication and provide space for the medical staff to

confirm in writing the days within a month when prescribed medication is provided to an inmate. (Id.).  When medicines are administered to inmates during pill call, the administering nurse signs or initials in the space provided for the applicable date of the month on an inmate's MAR, confirming provision of prescribed medication.  (Id.).  In short, an inmate's MARs record when prescription medication (including psychotropic medication) is provided, how much medication is provided, the date on which the medication is provided and the time period over which an inmate receives prescribed medication. (Id.).  All prescribed medications (including psychotropic medications) given to an inmate during his incarceration appear and/or are identified in his MARs.  (Id.).

As indicated by Plaintiff's MARs, Plaintiff has not received any psychotropic medication of any kind since June of 2003.  (Id. at ¶ 8).  In June, 2003, Plaintiff was prescribed and received Haloperidol, a psychotropic medication.  (Id.).  Plaintiff has not been prescribed or received Haloperidol since June 29, 2003.  (Id.).  Plaintiff does not have a current prescription for any psychotropic medication and is currently not receiving any psychotropic medication of any kind from PHS.  (Id. at ¶ 9).

According to Plaintiff's Mental Services Psychiatric Progress Notes dated June 20, 2005, Plaintiff's last evaluation by the mental health staff at Ventress did not result in any psychotropic medications being prescribed for him and a member of the mental health staff noted, "[Plaintiff] is not on any medicines."  (Id.).  This is the last entry in Plaintiff's mental health records, and there is no indication that Plaintiff has been placed back on psychotropic drugs since that time. (Id.).

Plaintiff has a history of violent behavior.  (Id. at ¶ 10).  A Psychological Interview/Data Entry Form dated May 22, 1996, indicates that Plaintiff's mental health must be managed in light

of his prior conviction of burglary, resulting in an assault on and injury to the victim. (Id.). Emergency Treatment Forms dated February 4, 2002 and November 3, 2004, indicate that Plaintiff admitted, "I was fighting. I got a few bumps and bruises." (Id.). Another document referencing the same incident entitled Referral to Mental Health also dated November 3, 2004, specifies that Plaintiff needed to be referred to mental health because he was not currently on psychotropic medications and, as a result, he was "picking fights" with other inmates. (Id.). On this same document, an evaluation of Plaintiff's mental status indicates that his demeanor was "Hostile, angry." (Id.).

### 3.    ALLEGATIONS APPLICABLE TO MEDICAL DEFENDANTS

Based on the foregoing facts of Plaintiff's allegations, only six (6) potential claims concern matters over which Medical Defendants have any responsibility or control, including: (1) disregarding Plaintiff's complaints, causing him to develop dementia (See Amended Complaint at 17-18 of 29); (2) altering Plaintiff's shaving profile resulting in threats from ADOC's officers (Id. at pp. 18-22 of 29); (3) disregarding Plaintiff's complaints concerning TB skin tests (Id. 22-26 of 29); (4) denying Plaintiff medical treatment on specified dates (Id. at p. 24 of 29); (5) failing to check Plaintiff's blood-sugar level (Id. at p. 24 of 29); and (6) disregarding Plaintiff's complaints of sores on his legs, hands, back, head and face (Id. at p. 25 of 29).

### B.    PLAINTIFF'S HISTORY OF MEDICAL TREATMENT DURING INCARCERATION

#### 1.    PLAINTIFF'S TRANSFER FROM BULLOCK TO VENTRESS AND SUBSEQUENT SCREENING

Plaintiff is an inmate currently incarcerated at Ventress. (See Rayapati Affidavit at ¶ 3; Floyd Affidavit at ¶ 3; Burks Affidavit at ¶ 3; Hunter Affidavit at ¶ 3). Immediately prior to this time, Plaintiff was incarcerated at Bullock. (See Siddiq Affidavit at ¶ 3; Robinson Affidavit at ¶

3; Taylor Affidavit at ¶ 3).  On or about March 3, 2005, Plaintiff was transferred from Bullock to

Ventress.  (See Transfer & Receiving Screening Form, Mar. 4, 2005; Receiving Screening Form,

Mar. 4, 2005).  At the time of his transfer to Ventress, Plaintiff had no visual signs of obvious

pain, illnesses requiring immediate treatment, evidence of any infection, signs of poor skin

condition or rashes.  (Id. at ¶¶ 2-5).  Moreover, Plaintiff did not report any history of TB,

diabetes or other serious medical conditions.  (Id. at ¶¶ 20-25).

**2.    SICK CALL REQUEST PROCESS AND PROCEDURES
AT VENTRESS AND BULLOCK**

When an inmate has a non-emergency medical or health problem and/or complaint, an

inmate may file a sick call request form in order to bring this problem or complaint to the

attention of the medical staff at Ventress and/or Bullock and/or request medical treatment for this

problem.  (See Rayapati Affidavit at ¶ 4; Floyd Affidavit at ¶ 4; Burks Affidavit at ¶ 11; Hunter

Affidavit at ¶ 4; Siddiq Affidavit at ¶ 4; Robinson Affidavit at ¶ 4; Taylor Affidavit at ¶ 4).  The

sick call request process is well-known at Ventress and Bullock and is utilized by inmates at

Ventress and Bullock on a daily basis.  (Id.).  When an inmate first arrives at Ventress and/or

Bullock, he is taken to the Health Care Unit to be processed into the system and receives an

orientation as to the availability of medical services at the facility as well as the procedures for

obtaining medical care.  (Id.).  During this orientation, the medical staff gives each inmate an

information sheet and verbally goes through the sheet with newly-arriving inmates, informing

them how to utilize the sick call request form process.  (Id.).  Sick call request forms are

available at the Health Care Unit or the ADOC's shift commander's office.  (Id.).

An inmate making a sick call request is required to complete the top portion of the sick

call request form (stating his name, the date of request, AIS number, date of birth, dorm location,

the nature of the problem or request and his signature) and submit the sick call request form by

placing it in a locked box located in the facility's kitchen (at Ventress) or located in the facility's Health Care Unit (at Bullock). (Id.). Sick call request forms are then brought to the Health Care Unit. (Id.). The sick call request forms are removed from the locked box each day at approximately 12:00 p.m. and marked as received by the medical records clerk or a nurse at that time. (Id.).

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to ADOC's officers in the various dorms at Ventress and/or Bullock, who then notify inmates in the particular dorms that sick call has begun. (Id.). Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints at the time they are summoned to the Health Care Unit for sick call. (Id.). The nurse conducting sick call takes reporting inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Ventress and/or Bullock. (Id.). If an inmate submits more than one (1) sick call request form on the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan. (Id.).

A submitted sick call request form that is not completed by PHS's medical staff indicates that an inmate failed to report when summoned to sick call. (Id.). If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit, and the inmate will not be required to wait until sick call begins. (Id.).

**3.  PLAINTIFF DID NOT SEEK TREATMENT FOR AND
WAS NOT DIAGNOSED WITH DEMENTIA AT
VENTRESS OR BULLOCK**

During his incarceration at both Ventress and Bullock, Plaintiff was not diagnosed with and did not seek any treatment for dementia.  (See Rayapati Affidavit at ¶ 5; Floyd Affidavit at ¶ 5; Burks Affidavit at ¶ 12; Hunter Affidavit at ¶ 5; Siddiq Affidavit at ¶ 5; Robinson Affidavit at ¶ 5).  Dementia is not a specific disease.  (Id.).  Dementia is a descriptive term for a collection of symptoms that can be caused by a number of disorders that affect the brain.  (Id.).  Inmates with dementia have significantly impaired intellectual functioning that interferes with normal activities and relationships.  (Id.)  Inmates with dementia also lose their ability to solve problems and maintain emotional control and they may experience personality changes and behavioral problems, such as agitation, delusions and hallucinations.  (Id.).  While memory loss is a common symptom of dementia, memory loss by itself does not conclusively lead to the diagnosis that a person has dementia.  (Id.).  Physicians diagnose dementia only if two or more brain functions (such as memory and language skills) are significantly impaired without loss of consciousness.  (Id.).  During his incarceration at Ventress and Bullock, Plaintiff has not demonstrated any of the impairments and/or symptoms required for a diagnosis of dementia.  (Id.).

**4.  SHAVING PROFILE RULES AND PROCEDURES AT
BULLOCK AND VENTRESS**

The ADOC has established general rules and/or guidelines governing the terms of incarceration for inmates within the Alabama prison system.  (See Rayapati Affidavit at ¶ 6; Floyd Affidavit at ¶ 6; Burks Affidavit at ¶ 13; Hunter Affidavit at ¶ 6; Siddiq Affidavit at ¶ 6; Robinson Affidavit at ¶ 6).  When an inmate should be allowed to deviate from a rule or guideline imposed by the ADOC for medical reasons, the medical staff must provide the inmate

with a document referred to as a "profile," which permits an inmate to be excepted from the application of an ADOC rules and/or guidelines.  (Id.).

The ADOC has adopted certain rules regarding shaving.  (Id.).  Shaving profiles are sometimes given to inmates at Ventress and Bullock who, because of the nature of the hair on their faces or because they develop razor bumps, are not required to shave with a razor.  (Id.). Instead, these inmates are allowed to use clippers or are allowed to grow facial hair not exceeding one-eighth (1/8) of an inch.  (Id.).

If an inmate wishes to request a shaving profile, he must submit a sick call request form. (Id.).  A nurse will then evaluate the inmate during the sick call process and refer the inmate to a nurse practitioner or physician, who are the only parties authorized to create a shaving profile for an inmate.  (Id.).  The nurse practitioner or physician will evaluate the inmate's facial skin irritation and either recommend or deny a shaving profile.  (Id.).  Physicians indicate where an inmate is allowed to have hair on his face by darkening areas on a paper drawing of a face.  (Id.). This paper document visually depicts an inmate's shaving profile.  (Id.).  When the profile is completed, the inmate is given a carbon copy of this profile to show physicians, nurses and ADOC's employees why his face is not completely shaven.  (Id.).

A shaving profile has an effective date and expiration date.  (Id.).  At Ventress and Bullock, shaving profiles may be effective from thirty (30) days to one (1) year.  (Id.).  If an inmate is transferred from one facility to another (i.e., such as Plaintiff's transfer from Bullock to Ventress), a nurse may copy the shaving profile from another facility to make it effective in the new facility.  (Id.).  When Plaintiff transferred from Bullock to Ventress, a member of the medical staff copied Plaintiff's shaving profile, which was provided to him at Bullock.  (See Rayapati Affidavit at ¶ 6; Floyd Affidavit at ¶ 6; Burks Affidavit ¶ 13; Hunter Affidavit ¶ 6).

Plaintiff currently has a shaving profile that does not expire until May 5, 2006.  (Id.).  Plaintiff has not been denied or refused a shaving profile at any time during his incarceration at Ventress. (Id.).

### 5.   PLAINTIFF DID NOT TEST POSITIVE FOR TB AT VENTRESS OR BULLOCK

Plaintiff has not tested positive for TB during his incarceration at Ventress or Bullock. (See Rayapati Affidavit at ¶ 7; Floyd Affidavit at ¶ 7; Burks Affidavit at ¶ 14; Hunter Affidavit at ¶ 7; Siddiq Affidavit at ¶ 7; Robinson Affidavit at ¶ 7).  TB is an infection with the bacterium *Mycobacterium tuberculosis*, which most commonly affects the lungs, but can also affect the central nervous system, lymphatic system, circulatory system, bones and joints.  (Id.).

There are two (2) types of TB: latent and active.  (Id.).  Latent TB results when an inmate is exposed to another individual with the TB virus and contracts the TB virus in its non-active state.  (Id.).  Inmates with latent TB cannot transmit the virus to other inmates.  (Id.).  Active TB may result when latent TB goes untreated.  (Id.).  If an inmate is exposed to TB, he may test positive after a TB skin test (otherwise known as and/or labeled a "PPD" skin test).  (Id.).  A TB skin test is given by needle in the inmate's forearm.  After the TB skin test is administered, the inmate returns to the Health Care Unit in two (2) to three (3) days to determine if the TB skin test is positive or negative.  (Id.).  If an inmate has been exposed to the TB virus (i.e., latent TB), the inmate will have an induration (i.e., hardening of skin), swelling or blister on the forearm where the test was given.  (Id.).  If there is no reaction, the skin will remain smooth at the site of the test without a reaction (i.e., a zero (0) millimeters reaction as indicated on the TB skin test results). (Id.).

A TB skin test is given as a preventive measure to allow the medical staff at Ventress and/or Bullock to identify those inmates who have been exposed to TB and take the necessary

steps to ensure that active TB does not develop.  (<u>Id.</u>).  If an inmate tests positive for TB, the inmate is given the medication isoniazid ("INH") as a preventative measure to prevent active TB from developing.  (<u>Id.</u>).

An inmate having a positive TB skin test is also given a chest X-ray to determine lung abnormality.  (<u>Id.</u>).  An inmate testing positive for active TB (which is contagious and can be passed from inmate-to-inmate) is also sent to a negative pressure isolation room at Kilby Correctional Facility ("Kilby") for monitoring and treatment.  (<u>Id.</u>).  After the inmate undergoes the initial treatment process at Kilby, three (3) sputum cultures are taken and must come back negative in order for the inmate to return to Ventress's and or Bullock's inmate population.  (<u>Id.</u>).  A sputum culture is a diagnostic test used to detect and confirm the presence of active TB within the lungs.  (<u>Id.</u>).  A sputum culture collection involves the patient coughing deeply to expel the sputum.  (<u>Id.</u>).  If the patient is unable to cough deeply enough to expel a sufficient sample, a suction tube or needle may be used to collect the sputum sample.  (<u>Id.</u>).  The sputum is coughed into or placed in a sterile container containing a substance that promotes bacterial and fungal growth.  (<u>Id.</u>).  If no fungi or bacteria grow, the test result is considered to be negative.  (<u>Id.</u>).  Because Plaintiff did not test positive for active TB at either Ventress or Bullock, he was not transferred to Kilby for isolation, monitoring and treatment.  (<u>Id.</u>).

Plaintiff received TB skin tests on April 14, 2004 (with corresponding results on April 17, 2004) and May 11, 2004 (with corresponding results on May 14, 2004), which indicated he had a zero (0) millimeter reaction to the TB skin test.  (<u>See</u> Rayapati Affidavit at ¶ 8; Floyd Affidavit at ¶ 8; Burks Affidavit at ¶ 15; Hunter Affidavit at ¶ 8; Siddiq Affidavit at ¶ 8; Robinson Affidavit at ¶ 8).  This indicates that Plaintiff was not exposed to the TB virus and had not contracted latent or active TB.  (<u>Id.</u>).  Plaintiff refused to take another TB skin test on April

26, 2005.  (See Rayapati Affidavit at ¶ 8; Floyd Affidavit at ¶ 8; Burks Affidavit at ¶ 15; Hunter Affidavit at ¶ 8).  As a result, Plaintiff was placed in segregation, as a safety precaution, beginning on April 28, 2005.  (Id.).

Plaintiff later agreed to take the TB skin test on June 24, 2005, while he remained in segregation.  (Id.).  After his negative test results were received, Plaintiff was released from segregation on June 30, 2005.  (Id.).  According to existing policy, Plaintiff was not released from segregation until the medical staff confirmed he had not contracted TB.  (Id.).

### 6. BLOOD-SUGAR TESTING—PLAINTIFF HAD A NORMAL BLOOD-SUGAR LEVEL AND NO HISTORY OF DIABETES AT VENTRESS OR BULLOCK

During his incarceration at Ventress and Bullock, the medical staff has and did test Plaintiff's blood-sugar level at his request.  (See Rayapati Affidavit at ¶ 11; Floyd Affidavit at ¶ 9; Burks Affidavit at ¶ 16; Hunter Affidavit at ¶ 9; Siddiq Affidavit at ¶ 9; Robinson Affidavit at ¶ 9).  The only inmates at Ventress and/or Bullock who have their blood-sugar levels regularly tested by the medical staff are diabetic inmates, whose blood-sugar levels require oversight by the medical staff.  (Id.).  When the medical staff tested Plaintiff's blood-sugar level, the results of this test placed him squarely within the normal range.  (Id.).  Plaintiff's lab test results taken on December 3, 2004 (reported on December 4, 2004), indicate that Plaintiff's "Glucose, Serum" level was "76 mg/dL."  (Id.).  The normal range limits are "65-99 mg/dL."  (Id.).  Plaintiff's test results fell well within this range.  (Id.).  Plaintiff has not been diagnosed with diabetes.  (Id.).

### 7. PLAINTIFF DID NOT SUFFER FROM ANY VISIBLE SORES AT VENTRESS OR BULLOCK

While incarcerated at Ventress, Plaintiff has not had any visible signs of sores on his legs, hands, back, head and face and did not have any visible signs of the same while at Bullock.  (See Rayapati Affidavit at ¶ 12; Floyd Affidavit at ¶ 10; Burks Affidavit at ¶ 17; Hunter Affidavit at ¶

10; Siddiq Affidavit at ¶ 10; Robinson Affidavit at ¶ 10). Plaintiff's only visible signs of skin irritation are on his face and neck. (Id.). To treat these areas of irritation, Plaintiff has been given a shaving profile, ointments and creams. (Id.). These areas of skin irritation are not open or draining and are not susceptible to infection. (Id.). Though Plaintiff believes that these areas of skin irritation are a result of a previously administered TB skin test, such irritation could not have been caused by the TB skin test. (Id.). A positive reaction to a TB skin test only causes an induration (i.e., hardening of the skin), swelling or blister on the forearm where the test was administered, not skin irritation to the inmate's face, neck or other parts of the inmate's body (other than the forearm). (Id.). Any areas where Plaintiff may be experiencing skin irritation, namely Plaintiff's face and neck, were and are continuing to be timely and appropriately treated by the medical staff at Ventress and/or Bullock. (Id.).

### 8.    MALINGERING—PLAINTIFF'S HISTORY OF FALSIFYING OR CREATING NON-EXISTENT HEALTH PROBLEMS

After receiving negative results from his TB skin test, Plaintiff continued to assert complaints regarding his opinion that he had contracted active TB. (See Rayapati Affidavit at ¶ 9). In addition to his complaints about active TB, Plaintiff made complaints during his incarceration at Ventress regarding various other ailments including: rashes, scabs on his legs, itching, sinus problems, joint popping, stiffness and headaches. (Id.). Though Dr. Rayapati evaluated and treated Plaintiff for each of these complaints, he has continually noted in his medical records and that he believes Plaintiff is malingering (i.e., creating medical problems that do not exist based upon my examinations and observations). (Id.; see also PHS Progress Notes, May 16, 2005, June 7, 2005, June 23, 2005).

Malingering is a deliberate behavior for a known, external purpose. (<u>See</u> Rayapati Affidavit at ¶ 9). It is not considered a form of mental illness or psychopathology in and of itself, although it can and does occur in the context of other mental illnesses. (<u>Id.</u>). Malingering can be expressed in several forms ranging from pure malingering, in which the individual falsifies all symptoms, to partial malingering, in which the individual has symptoms but exaggerates the impact which they have upon daily functioning. (<u>Id.</u>).

Because Plaintiff continually engaged in malingering, many times submitting multiple sick call requests on the same day for alleged ailments for which there were no physical signs, Dr. Rayapati referred him to Mental Health for a psychiatric evaluation, counseling and reality test in order to assure Plaintiff understood that he should not create or falsify his past, present or future medical history, current problems and/or other ailments. (<u>Id.</u>). It is well-known in the medical field that people who malinger rarely accept psychiatric referral. (<u>Id.</u>). However, in Plaintiff's case, Dr. Rayapati wanted to ensure and/or verify that his malingering did not stem from an underlying mental illness such hypochondria, severe depression or another anxiety disorder. (<u>Id.</u>). Based on Dr. Rayapati's medical judgment, Plaintiff's real, non-feigned health problems include: facial skin irritation (which poses no serious health threat), sinus problems (which are currently being treated) and headaches (which stem from vision problems for which Plaintiff has been prescribed corrective glasses). (<u>Id.</u> at ¶ 10).

### 9. PHS TIMELY AND APPROPRIATELY PROVIDED MEDICAL TREATMENT TO PLAINTIFF AT VENTRESS AND BULLOCK

PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress and Bullock have responded in a timely and appropriate manner to the requests for medical treatment submitted by Plaintiff during his incarceration. (<u>See</u> Rayapati Affidavit at ¶ 13; Floyd Affidavit

at ¶ 11; Burks Affidavit at ¶ 20; Hunter Affidavit at ¶ 11; Siddiq Affidavit at ¶ 11; Robinson Affidavit at ¶ 13; Taylor Affidavit at ¶ 5).   The medical staff at Ventress and Bullock has not ignored any of Plaintiff's medical complaints or refused in any way to provide him with any necessary medical treatment.   (Id.).   On each occasion that Plaintiff has made medical complaints, the medical staff provided Plaintiff with timely and appropriate medical care and treatment for his problems.  (Id.).

### C.    GRIEVANCES FILED BY PLAINTIFF DURING INCARCERATION

#### 1.    GRIEVANCE PROCEDURES AND COMPLAINTS AT BULLOCK

PHS has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at Bullock.  (See Robinson Affidavit at ¶ 11).  The existence of the grievance procedure is well-known among the prison population at Bullock, as indicated by the fact that numerous informal and/or formal grievances are received on a regular basis.  (Id.).  The grievance process consists of two steps.   (Id.).   In order to initiate the grievance process, an inmate must submit an "informal" grievance, describing his complaint or complaints about medical treatment he has sought or received at Bullock.   (Id.).   Within five (5) days of submission of an informal grievance, the medical staff at Bullock provides a response to the grievance.  (Id.).  If an inmate is displeased or not satisfied with the response to his informal grievance, he may submit a "formal" grievance, explaining why he is displeased or not satisfied with the response provided by the medical staff.  (Id.).  The medical staff provides a response to any grievance submission within five (5) days.  (Id.).

Informal and formal grievance forms are available to all inmates and may be obtained from Robinson, Health Services Administrator ("HSA") at Bullock, directly or from the Health

Care Unit shift commander's station, which is located within the Health Care Unit at Bullock and is readily accessible to all inmates throughout the day. (Id.). Inmates are instructed to place completed grievance forms in the locked, brown box located in the Health Care Unit. (Id.). Prior to 12:00 p.m. every day, a medical records clerk opens the locked brown box, retrieves any grievances contained in the box and provides any grievances to Robinson. (Id.).

Robinson reviews the grievances at least once a week, provides a written response at the bottom of the form and returns a copy of the completed grievance form to the inmate. (Id.). An additional copy of the completed grievance is placed in the inmate's medical records file. (Id.). Robinson encourages inmates who have complaints about the medical care they have sought or received at Bullock to utilize this grievance process. (Id.).

***While at Bullock, Plaintiff's medical records do not indicate that he filed a single grievance, "informal" or "formal," against PHS's physicians, nurse practitioners, nurses or other medical personnel regarding the treatment he was receiving from the medical staff.*** (See Stanford Affidavit and attached medical records).

### 2.    GRIEVANCE PROCEDURES AND COMPLAINTS AT VENTRESS

PHS has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at Ventress. (See Burks Affidavit at ¶ 18). When an inmate first arrives at Ventress, he is taken to the Health Care Unit to be processed into the system and receives an orientation as to the availability of medical services at the facility as well as the procedures for obtaining medical care. (Id.). At this time, inmates are verbally advised and given written notification of the procedures that must be utilized to have access health care. (Id.). This notice explains the

procedure for inmates to follow in order to submit a sick call request form and instructs inmates as to how to file a grievance.  (Id.).

The existence of Ventress's grievance procedure is well-known among the prison population, as indicated by the fact that Burks, HSA at Ventress, receives numerous inmate requests and/or inmate grievances on a daily basis.  (Id.).  PHS's physicians, nurse practitioners, nurses and other medical personnel attempt to resolve all inmate concerns prior to an "inmate grievance" being submitted.  (Id.).  The grievance process is initiated when an inmate submits an "inmate request" to Burks through the institutional mail system.  (Id.).  This request is reviewed by Burks and an interview is arranged within five (5) days of receipt of the inmate request.  (Id.).  If the inmate is not satisfied with the outcome of this interview, an "inmate grievance" may be submitted with a written response to follow within three (3) days of receipt of the inmate grievance.  (Id.).  If the inmate grievance cannot be resolved to the inmate's satisfaction, the inmate may then file an "inmate grievance appeal," whereby the written inmate grievance will be reviewed through the facility review process.  (Id.).

Inmate grievance and inmate grievance appeal forms may be picked up from the shift commander's office at Ventress, which is accessible to all inmates throughout the day.  (Id.).  Inmates are instructed to place completed inmate requests and/or inmate grievance forms in the sick call box and/or request box located in the kitchen (otherwise referred to as the chow hall).  (Id.).  When received in the Health Care Unit, inmate request and/or inmate grievance forms are sent to Burks by the medical records clerk or administrative assistant.  (Id.).  Burks reviews the grievances at least once a week, provides a written response at the bottom of the form and returns a copy of the completed grievance form to the inmate.  (Id.).  Burks encourages inmates who

have complaints about the medical care they have sought or received at Ventress to utilize this grievance process. (Id.).

Plaintiff first filed a grievance at Ventress on May 12, 2005, that did not state any health complaints; rather, Plaintiff inquired as to whether his prescribed glasses had arrived without making any health complaints. (See Letter to Head Nurse, May 12, 2005). On June 21, 2005, Plaintiff complained about having to make a $3.00 co-pay in order to fill out each sick call request slip (as is required of all inmates upon filing such a request). (See Inmate Informal Grievance, June 21, 2005). On this same date, Plaintiff stated that physicians were treating his health problems, but not in the way he desired. (Id.). On June 28, 2005, Plaintiff submitted a request to receive information regarding a previously taken TB skin test, without making any health complaints. (See Inmate Request Slip, June 28, 2005). On July 6, 2005, Plaintiff again submitted a request that he be provided with a TB skin test information sheet, that PHS provide its corporate address and that PHS provide the correct spelling of Dr. Rayapati's name. (See Inmate Request Slip, July 6, 2005). On July 7, 2005, Plaintiff submitted a complaint asserting that he had submitted numerous sick call requests and again complained about the $3.00 co-pay required for each submission. (See Inmate Informal Grievance, July 7, 2005). In this same grievance, Plaintiff again stated that physicians were treating his health problems, but not in the way he desired. (Id.). Plaintiff's next request was submitted on July 13, 2005, when he again requested a TB skin test information sheet. (See Inmate Stationary, July 13, 2005). On that same day, Plaintiff again filed a grievance regarding the payment of a $3.00 co-pay each time he submitted a sick call request. (See Inmate Stationary, July 13, 2005). Plaintiff's final grievance came on July 15, 2005, wherein he again requested a TB skin test information sheet. (See Inmate Grievance, July 15, 2005). Plaintiff also alleged that he had been neglected treatment by

the medical staff.  (<u>Id.</u>).  At this time, Plaintiff again protested the requirement of having to make

a $3.00 co-pay upon the submission of each sick call request.  (<u>Id.</u>).

## III.    DISCUSSION

### A.    PLAINTIFF FAILS TO SATISFY HIS BURDEN OF ESTABLISHING THE EIGHTH AMENDMENT STANDARD THAT MEDICAL DEFENDANTS ACTED WITH "DELIBERATE INDIFFERENCE" TO A "SERIOUS MEDICAL NEED."

It is evident from Plaintiff's Amended Complaint that he is attempting to state a claim

against Medical Defendants for an alleged delay and/or denial of medical care.  (<u>See</u> Amended

Complaint at pp. 17-26 of 29).  The Eighth Amendment[11] to the United States Constitution

governs the conditions of confinement for prisoners and the treatment of these prisoners during

the term of their incarceration.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Helling v.</u>

<u>McKinney</u>, 509 U.S. 25, 31 (1993)); <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986);

<u>Rhodes v. Chapman</u>, 452 U.S. 337, 345-46 (1981) (writing that the standard of "cruel and

unusual punishments" applies to prison conditions).  An alleged Eighth Amendment violation

may be actionable under 42 U.S.C. § 1983.[12]  Courts have devoted an extraordinary amount of

time clearly defining the requirements for asserting and succeeding upon a claim for an Eighth

Amendment violation under § 1983.  In its well-known opinion in <u>Estelle v. Gamble</u>, the United

States Supreme Court instructed that an Eighth Amendment claim only exists when a prison

---

[11]    Though liability arising out of the treatment of pretrial detainees triggers Fourteenth Amendment considerations, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner . . ." <u>See</u> <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1573-74 (11th Cir. 1985).  To the extent Medical Defendants rely upon any cases addressing the application of the Fourteenth Amendment in the prison context, such cases are equally applicable in this case.

[12]    42 U.S.C. § 1983 provides, in pertinent part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

official engages in the "unnecessary and wanton infliction of pain." 429 U.S. 97, 105 (1976). The Estelle Court interpreted this phrase to mean prison officials must not act with "deliberate indifference to serious medical needs of prisoners." Id. Subsequent decisions by the Supreme Court and Eleventh Circuit have described the Eighth Amendment standard as including both "objective" and "subjective" components. See e.g. Farmer, 511 U.S. 825 at 834, 837; Chandler v. Crosby, 379 F.3d 1278, 1289-90 (11th Cir. 2004).

The *"objective" component* of the Eighth Amendment analysis requires a prisoner to demonstrate the existence of a condition, act or omission which is sufficiently egregious to violate the Eighth Amendment. See Hudson v. McMillian, 503 U.S. 1, 8 (1992). The underlying conduct or condition must be "extreme" and pose "an unreasonable risk of serious damage to his future health," if left unchecked. Chandler, 379 F.3d at 1289-90 (quoting Hudson, 503 U.S. at 9) (other citations omitted). In the context of a claim for delayed or refused medical treatment, a prisoner must establish the existence of "a serious medical need." Chandler, 379 F.3d at 1289-90; Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). The long-standing definition of a "serious medical need" in the Eleventh Circuit is as follows: a serious medical need is a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow, 320 F.3d at 1243 (citing Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotations omitted)). Additionally, the serious medical need must be such that, if left untreated, "pos[es] a substantial risk of serious harm." Farmer, 511 U.S. at 834. The burden falls squarely upon Plaintiff to allege and ultimately establish the existence of a serious medical need. See e.g. Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985).

Even if Plaintiff experienced a serious medical need during his incarceration at either Bullock or Ventress, which he has not, he must also establish the *"subjective" component* of an Eighth Amendment violation. Plaintiff must prove that the Medical Defendants acted with "deliberate indifference." See e.g. Farmer, 511 U.S. at 837. In Farmer, the Supreme Court wrote "deliberate indifference" exists when "the official knows of and disregards an excessive risk to inmate health or safety . . . ." Id.; see also Wilson v. Seller, 501 U.S. 294, 303 (1991). The mere fact that a prison official should have known of or perceived a risk is of no consequence under the Eighth Amendment analysis. Farmer, 511 U.S. at 838. It is incumbent upon a prisoner asserting a § 1983 claim to establish "conscious or callous indifference" on the part of the prison official. See e.g. Daniels v. Williams, 474 U.S. 327 (1986); Brown v. Hughes, 894 F.2d 1533, 1537-38 (11th Cir. 1990). In sum, a prisoner's § 1983 claim for an alleged delay in medical treatment cannot survive summary judgment unless the inmate produces evidence "of the prison official's subjective awareness" of the alleged medical condition and an "intentional refusal [by the official] to provide . . . care." Id.; Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996)); Hill, 40 F.3d at 1186). Without evidence of this "specific intent," a prisoner's § 1983 claim cannot succeed. Steele, 87 F.3d at 1269.

Courts have also identified the specific type of alleged conduct which does *not* rise to the level of "deliberate indifference." In Crosby, the Eleventh Circuit held that *a prisoner's discomfort does not give rise to an Eighth Amendment violation*. 379 F.3d at 1295 (citations omitted and emphasis added). Moreover, liability under the Eighth Amendment cannot exist for negligence in diagnosing or treatment of an inmate's alleged medical condition. Estelle, 429 U.S. at 106. The Eighth Amendment does not prohibit or provide any remedy for any "accidental

inadequacy . . . or even medical malpractice[13] actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotations and citation omitted).

In cases when a prisoner actually receives medical treatment, courts have altered their analysis of § 1983 medical claims.  As to claims of delayed medical treatment, the Eleventh Circuit has instructed courts to be hesitant to find an Eighth Amendment violation when officials provide medical care to prison inmates.  McElligott v. Foley, 182 F.3d 1248, 1259 (11th Cir. 1999) (citing Waldrup v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)).  In fact, a prisoner alleging delayed medical treatment must show that the official acted with deliberate indifference, meaning the official knew of the serious medical condition and "intentionally or with reckless disregarded, delayed treatment."  Hinson v. Edmond, 192 F.3d 1342, 1348 (11th Cir. 1999).  In Hill, the Eleventh Circuit added:

> Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a lay person because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.  In contrast, *delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute an Eighth Amendment violation*. * * * Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the condition, and considering the reason for the delay.

40 F.3d 1176, 1188-89 (11th Cir. 1994) (emphasis added).  Hence, whether a claim arises from delayed treatment depends upon "the nature of the medical need and the reason for the delay." Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994).

Based on Plaintiff's allegations, only the following six (6) potential claims concern matters over which Medical Defendants have any responsibility or control: (1) disregarding

---

[13]    As the Supreme Court concluded, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Estelle, 429 U.S. at 107.

Plaintiff's complaints, causing him to develop dementia (See Amended Complaint at 17-18 of 29); (2) altering Plaintiff's shaving profile resulting in threats from ADOC's officers (Id. at pp. 18-22 of 29); (3) disregarding Plaintiff's complaints concerning TB skin tests (Id. 22-26 of 29); (4) denying Plaintiff medical treatment on specified dates (Id. at p. 24 of 29); (5) failing to check Plaintiff's blood-sugar level (Id. at p. 24 of 29); and (6) disregarding Plaintiff's complaints of sores on his legs, hands, back, head and face (Id. at p. 25 of 29).  With regard to each of these allegations, Plaintiff fails to show that he has a "serious medical need" and that Medical Defendants acted with "conscience or callous indifference."

It should be emphasized that PHS's physicians, nurse practitioners, nurse and other medical personnel have evaluated and treated Plaintiff for each of these complaints on a regular basis.  (See Rayapati Affidavit at ¶ 13; Floyd Affidavit at ¶ 11; Burks Affidavit at ¶ 20; Hunter Affidavit at ¶ 11; Siddiq Affidavit at ¶ 11; Robinson Affidavit at ¶ 13; Taylor Affidavit at ¶ 5).  As such, Medical Defendants contend that each of Plaintiff's allegations are frivolous, malicious and fail to state a claim upon which relief can be granted, thereby warranting dismissal.

        1.        **PLAINTIFF HAS NEVER BEEN DIAGNOSED WITH OR SOUGHT TREATMENT FOR DEMENTIA.**

Plaintiff asserts in his Amended Complaint, addressing an alleged altercation with Sergeant Seals (an ADOC employee), "I, [Plaintiff] later found out there's a disease call[ed] dementia which leads plaintiff to believe that's what Mrs. Seals [was] talking about.  And that the defendants intended to avoid plaintiff complaints of illness . . . .  I found out . . . that the life expectancy for a dementia victim is (6) to (8) years after onset."  (See Amended Complaint at p. 17 of 29).

Plaintiff does not claim that he has ever suffered from or been diagnosed with dementia, nor do his medical records support any contention that he has dementia.  Plaintiff instead makes

a cursory statement of his "belief" that Mrs. Seals, an ADOC employee over which PHS has no control, intended to cause him to develop dementia.  (Id.).  First, PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress and Bullock are not responsible for actions taken by ADOC's officers and/or other personnel.  (See Burks Affidavit at ¶ 19; Robinson Affidavit at ¶ 12).  Second, as discussed supra at Part II.B.3, during his incarceration at both Ventress and Bullock, Plaintiff was not diagnosed with and did not seek any treatment for dementia.  (See Rayapati Affidavit at ¶ 5; Floyd Affidavit at ¶ 5; Burks Affidavit at ¶ 12; Hunter Affidavit at ¶ 5; Siddiq Affidavit at ¶ 5; Robinson Affidavit at ¶ 5).  Further, during his incarceration at Ventress and Bullock, Plaintiff has not and did not demonstrate any of the impairments and/or symptoms required for a diagnosis of dementia.  (Id.).  Based on the foregoing, Plaintiff's alleged dementia does not qualify as a "serious medical need."

**2.    PLAINTIFF CURRENTLY HAS A SHAVING PROFILE, HAS NEVER BEEN DENIED A SHAVING PROFILE AND HAS NEVER HAD HIS SHAVING PROFILE ALTERED.**

Plaintiff alleges that an ADOC officer had an unspecified nurse "alter plaintiff['s] shaving profile [to the ADOC officer's] specification, not as the doctor had suggested the profile should read due to plaintiff infected face," thereby resulting in threats from other ADOC officers. (See Amended Complaint at pp. 18-22).

First, Plaintiff's allegations largely involve the conduct of ADOC's officials and/or employees whom he claims had his shaving profile altered.  (Id.).  As previously stated, PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress and Bullock are not responsible for actions taken by ADOC's officers and/or other personnel.  (See Burks Affidavit at ¶ 19; Robinson Affidavit at ¶ 12).  Second, as discussed supra at Part II.B.7., Plaintiff's only visible signs of skin irritation are on his face and neck.  (See Rayapati Affidavit

at ¶ 12; Floyd Affidavit at ¶ 10; Burks Affidavit at ¶ 17; Hunter Affidavit at ¶ 10; Siddiq Affidavit at ¶ 10; Robinson Affidavit at ¶ 10).  To treat these areas of skin irritation, the medical staff provided Plaintiff with a shaving profile, ointments and creams.  (Id.).  These areas of skin irritation are not open or draining and are not susceptible to infection, thereby precluding Plaintiff's ability to establish that his facial skin irritation is a "serious medical need."  (Id.). Third, as discussed supra at Part II.B.2., the sick call request process, by which an inmate obtains a shaving profile, is well-known at both Ventress and Bullock.  (See Rayapati Affidavit at ¶ 4; Floyd Affidavit at ¶ 4; Burks Affidavit at ¶ 11; Hunter Affidavit at ¶ 4; Siddiq Affidavit at ¶ 4; Robinson Affidavit at ¶ 4; Taylor Affidavit at ¶ 4).

When Plaintiff transferred from Bullock to Ventress, a member of the medical staff copied Plaintiff's shaving profile, which was provided to him at Bullock.  (See Rayapati Affidavit at ¶ 6; Floyd Affidavit at ¶ 6; Burks Affidavit ¶ 13; Hunter Affidavit ¶ 6; see also Shave Profile Authorization Forms, Mar. 2, 2005).  As evidenced by the visual shaving profile depictions, Plaintiff's shaving profile was not altered at the time he was transferred from Bullock to Ventress, it was merely copied.  (Id.).  Plaintiff currently has a shaving profile that does not expire until May 5, 2006.  (Id.).  Plaintiff has not been denied or refused a shaving profile at any time during his incarceration at Ventress or Bullock.  (See Rayapati Affidavit at ¶ 6; Floyd Affidavit at ¶ 6; Burks Affidavit ¶ 13; Hunter Affidavit ¶ 6; Siddiq Affidavit at ¶ 4; Robinson Affidavit at ¶ 4; Taylor Affidavit at ¶ 4; see also Shave Profile Authorization, Nov. 16, 2004 through May 5, 2005).

### 3. PLAINTIFF NEVER TESTED POSITIVE FOR TB DURING HIS INCARCERATION AT VENTRESS OR BULLOCK.

Concerning TB, Plaintiff alleges in his Amended Complaint:

> Plaintiff was intentionally allowed to be around two (2) inmates which had tested positive and/or had been [prescribed] medication for (T.B.). . . . Plaintiff complained to the Prison Health Services . . . . employees but they failed to give plaintiff any medical treatment/attention [concerning] (T.B.) symptoms. . . . On April 26, 2005, the (P.H.S.) medical staff [disregarded the allergic reaction] the (T.B.) skin test had on him, after consecutively [taking] five (5) T.B. skin [tests] within the past 10 months.

(See Amended Complaint at pp. 22-26 of 29). The aforementioned allegations misstate the number of TB skin tests Plaintiff has taken and his lack of a reaction to those same TB skin tests.

As discussed supra at Part II.B.5., Plaintiff did not test positive for TB during his incarceration at Ventress or Bullock. (See Rayapati Affidavit at ¶ 7; Floyd Affidavit at ¶ 7; Burks Affidavit at ¶ 14; Hunter Affidavit at ¶ 7; Siddiq Affidavit at ¶ 7; Robinson Affidavit at ¶ 7). Plaintiff has contracted neither latent nor active TB. (Id.). *Latent TB results when an inmate is exposed to another individual with the TB virus and contracts the TB virus in its non-active state, and inmates with latent TB cannot transmit the virus to other inmates.* (Id.) (emphasis added). Active TB may result when latent TB goes untreated. (Id.). It has been conclusively established that Plaintiff does not have latent or active TB because he has never tested positive after a TB skin test, evidenced by the fact that he did not have an induration (i.e., hardening of skin), swelling or blister on the forearm where the test was given. (Id.). Plaintiff's lack of a reaction to a TB skin test was visibly confirmed as negative because the skin where the TB skin test was administered remained smooth without a reaction (i.e., a zero (0) millimeters reaction as indicated on the TB skin test results). (Id.). Because Plaintiff did not test positive to any TB skin test, he was not prescribed INH medication, he was not given a chest X-ray, he was

not sent to a negative pressure room at Kilby for monitoring and treatment and sputum cultures were not taken to detect active TB. (Id.). These steps were not necessary because Plaintiff did not test positive after a TB skin test. (Id.).

Further, Plaintiff has taken only three (3), not five (5) (as Plaintiff asserts), TB skin tests. As discussed supra at Part II.B.5., Plaintiff received TB skin tests on April 14, 2004 (with corresponding results on April 17, 2004) and May 11, 2004 (with corresponding results on May 14, 2004), which indicated he had a zero (0) millimeter reaction to the TB skin test. (See Rayapati Affidavit at ¶ 8; Floyd Affidavit at ¶ 8; Burks Affidavit at ¶ 15; Hunter Affidavit at ¶ 8; Siddiq Affidavit at ¶ 8; Robinson Affidavit at ¶ 8; see also Health Evaluation, Apr. 14, 2004; TB Skin Test Report, May 11, 2004). Again, this means that Plaintiff was not exposed to the TB virus and did not contract latent or active TB. (Id.). Plaintiff refused to take another TB skin test on April 26, 2005. (See Rayapati Affidavit at ¶ 8; Floyd Affidavit at ¶ 8; Burks Affidavit at ¶ 15; Hunter Affidavit at ¶ 8; see also Yearly Health Evaluation, Apr. 26, 2004). As a result, Plaintiff was placed in segregation, as a safety precaution, beginning on April 28, 2005. (Id.; see also Segregation Log, Apr. 28, 2005 through June 30, 2005). Plaintiff later agreed to take the TB skin test on June 24, 2005, while he remained in segregation. (Id.; see also Yearly Health Evaluation, June 24, 2005). After his test negative results were received, Plaintiff was released from segregation on June 30, 2005. (Id.; see also Segregation Log, Apr. 28, 2005 through June 30, 2005). According to existing policy, Plaintiff was not released from segregation until the medical staff confirmed he had not contracted TB. (Id.).

Because Plaintiff has never had a positive reaction to a TB skin test, it has been conclusively established that Plaintiff does not have either latent or active TB; therefore, Plaintiff does not have a "serious medical need." Further, Plaintiff's negative skin test results prove

Plaintiff was not exposed to another inmate with latent or active TB, thereby making his allegations that he was exposed to other inmates having the TB virus false. Likewise, PHS's physicians, nurse practitioners, nurse and medical staff have taken all measures necessary to ensure that Plaintiff, other inmates and themselves have been protected from the TB virus, as evidenced by their prompt action to remove Plaintiff from the inmate population at Ventress until it could be confirmed that he did not have the TB virus. Common sense dictates that if Plaintiff had tested positive for TB, PHS's physicians, nurse practitioners, nurses and medical personnel, as well as ADOC's officers and personnel, would have mandated that Plaintiff be treated in a timely and appropriate manner. As one Alabama district court clearly articulates,

> Plaintiff would apparently have this Court "buy-in" to a position that is simply counterintuitive: that the defendants would allow tuberculosis to run rampant at [the prison] thereby imperiling the health of not only all the inmates housed there but also the prison officials who breathe the same air as those inmates. [There is] no doubt that the paramount interest of each and every named defendant is his own health and safety and therefore, it simply does not follow that the defendants would imperil their own health by allowing a contagious disease to run rampant in their environs.

Gooden v. Haley, No. CA 99-0611-CB-C, 2000 U.S. Dist. LEXIS 1829, at *16 n.6 (S.D. Ala. Jan. 20, 2000). Clearly, Medical Defendants have an overwhelming interest in protecting their own health as well as Plaintiff's health, further evidencing that Plaintiff has not contracted the TB virus and supporting the propositions that his allegations are unfounded and he is malingering.

### 4. PLAINTIFF HAS NOT BEEN DENIED NECESSARY MEDICAL TREATMENT ON ANY OCCASION.

In his Amended Complaint, Plaintiff alleges that, "Plaintiff ask[ed] for medical help/treatment at [Bullock] and at [Ventress] on the following dates and never receive[d] proper

treatment.  Plaintiff requested treatment on November 10th, 17th, 22nd, 23rd, 24th, 30th, of

2004; December 2nd, 7th, 11th, 16th, 21st of 2004."  (<u>See</u> Amended Complaint at p. 24 of 29).

As a preliminary matter, Plaintiff was incarcerated at Bullock on each of the dates in

question.  Plaintiff was not transferred from Bullock to Ventress until on or about March 3, 2005.

(<u>See</u> Rayapati Affidavit at ¶ 3; <u>see also</u> Transfer & Receiving Screening Form, Mar. 4, 2005;

Receiving Screening Form, Mar. 4, 2005).  Therefore, any allegation that Medical Defendants at

Ventress denied and/or delayed providing Plaintiff medical treatment is erroneous.

Plaintiff was and is well-aware of the sick call request procedures in place at both

Bullock and Ventress, as discussed <u>supra</u> at Part II.B.2.  This is evidenced by the more than

forty-six (46) sick call request forms he has completed while incarcerated at both Bullock and

Ventress.  (<u>See</u> Sick Call Request Forms, May 24, 1996 through Aug. 13, 2005).  An inmate

making a sick call request is required to complete the top portion of the sick call request form

(stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the

problem or request and his signature) and submit the sick call request form by placing it in a

locked box located in the facility's kitchen.  (<u>See</u> Dr. Rayapati Affidavit at ¶ 4; Floyd Affidavit

at ¶ 4; Burks Affidavit at ¶ 11; Hunter Affidavit at ¶ 4; Siddiq Affidavit at ¶ 4; Robinson

Affidavit at ¶ 4; Taylor Affidavit at ¶ 4).  Upon reviewing the sick call request forms, the

medical staff compiles a list of inmates having submitted sick call request forms, which is then

provided to correctional officers in the various dorms at Ventress and/or Bullock who are

responsible for notifying inmates in the particular dorms that sick call has begun.  (<u>Id.</u>).  ***Inmates***

***who submit sick call request forms are responsible for reporting to the Health Care Unit for***

***evaluation of their complaints at the time they are summoned to the Health Care Unit for sick***

***call***.  (<u>Id.</u>)  (emphasis added).  If an inmate submits more than one (1) sick call request form on

the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan. (Id.). *If the inmate fails to report to sick call when summoned, this is often indicated in the sick call request form because the sick call request form is left blank, i.e. not completed, by the medical staff*. (Id.). As evidenced by Plaintiff's medical records, he timely received appropriate medical treatment if and when he reported for sick call.

On November 10, 12, 15, 17 and 22, 2004, Plaintiff filled out six (6) sick call request forms. (See Sick Call Request Forms, Nov. 10 through Nov. 22, 2004). Plaintiff's alleged health complaints included: sores and scabs on legs, rash in penis area, razor bumps, loss of vision, loss of hair, low energy (at times), weight loss, easy breaking of skin and an upset stomach. (Id.). On each of the above-mentioned dates, Plaintiff failed to report to sick call to be evaluated by a physician, nurse practitioner and/or nurse. (Id.). Plaintiff's failure to appear is evidenced by sick call request forms marked, "no show," and others left incomplete in the portion required to be completed by a physician, nurse practitioner and/or nurse. (Id.). Though Plaintiff failed to report to sick call, he was still permitted to be treated by a physician on November 16, 18 and 19, 2004. (See Physicians' Orders, Nov. 16, 18 & 19, 2004). On November 23 and 24, 2004, Plaintiff completed sick call request forms, alleging the same complaints as made in his previous requests. (See Sick Call Request Forms, Nov. 23 & 24, 2005). Plaintiff was evaluated by a nurse on November 24, 2005, and an appointment to see a physician was scheduled. (Id.). Plaintiff was treated by a physician on November 24, 2005. (See PHS Physicians' Orders, Nov. 24, 2005; PHS Progress Notes, Nov. 24, 2005).

On November 30, December 2, 7 and 9, 2004, Plaintiff again filled out sick call request forms, alleging the same above-mentioned health ailments. (See Sick Call Request Forms, Nov.

30 through Dec. 7, 2004). On each of these dates, Plaintiff was either evaluated by a nurse or failed to report for sick call. (Id.). Again, this is evidenced by portions of the sick call request forms being left incomplete. (Id.). Though Plaintiff failed to report to sick call on these dates, his medical records indicate that he was still treated by a physician on December 10, 2004. (See Sick Call Request Form, Dec. 10, 2004).

On December 11, 2004, Plaintiff completed a sick call request form, alleging that he was having headaches (since his fight with another inmate) and stomach pains. (See Sick Call Request Form, Dec. 11, 2004). Plaintiff was treated for these alleged ailments on December 12, 2004, and an appointment to be evaluated by a physician was scheduled. (Id.). On December 14, 2004, Plaintiff alleged the same complaints and was timely evaluated by a nurse. (See Sick Call Request Form, Dec. 14, 2004). On December 16, 2004, Plaintiff maintained that he was also having blood in his stool and was immediately seen by Dr. Siddiq on December 17, 2004, to evaluate and treat this problem. (See PHS Physicians' Orders, Dec. 17, 2004). On December 21, 2004, Plaintiff filled out a sick call request form alleging stomach pains, headaches and an irregular heartbeat. (See Sick Call Request Form, Dec. 21, 2004). Plaintiff was treated by a nurse and physician on December 23, 2004. (Id.; PHS Physicians' Orders, Dec. 23, 2004).

On each of the above-mentioned dates that Plaintiff alleged he sought but failed to receive medical treatment, PHS's physicians, nurse practitioners, nurses and other medical personnel at Bullock responded in a timely and appropriate manner to the requests for medical treatment submitted by Plaintiff. (See Siddiq Affidavit at ¶ 11; Robinson Affidavit at ¶ 13; Taylor Affidavit at ¶ 5). The medical staff at Bullock has not and did not ignore any of Plaintiff's medical complaints or refuse in any way to provide him with any necessary medical treatment. (Id.). On each occasion that Plaintiff has made medical complaints, the medical staff

provided Plaintiff with timely and appropriate medical care and treatment for his problems. (Id.).    Therefore, Plaintiff cannot establish that Medical Defendants were "deliberately indifferent" to any "serious medical need."

5.    **PLAINTIFF DOES NOT HAVE DIABETES, AND HIS BLOOD-SUGAR LEVEL IS WELL-WITHIN THE NORMAL RANGE.**

Plaintiff alleges in this Amended Complaint that, "Plaintiff ask[ed] for his sugar level check ([trying] to diagnose his sickness/illness due to defendants neglect) . . . ." (See Amended Complaint at pp. 24-25).  As previously discussed supra at Part II.B.6., Plaintiff is not a diabetic, and the only inmates at Ventress and/or Bullock who have their blood-sugar levels regularly tested are inmates who are diabetic, whose blood-sugar level require oversight by the medical staff.  (See Rayapati Affidavit at ¶ 11; Floyd Affidavit at ¶ 9; Burks Affidavit at ¶ 16; Hunter Affidavit at ¶ 9; Siddiq Affidavit at ¶ 9; Robinson Affidavit at ¶ 9).  (Id.).  When the medical staff tested Plaintiff's blood-sugar level, at his request, the results of this test placed him squarely within the normal range.  (Id.).  Plaintiff's lab test results taken on December 3, 2004 (reported on December 4, 2004), indicate that Plaintiff's "Glucose, Serum" level was "76 mg/dL."  (Id.). The normal range limits are "65-99 mg/dL."  (Id.).  Plaintiff's test results fall well within this range.  (Id.).  Moreover, Plaintiff has not been diagnosed with diabetes.  (Id.).  Therefore, Plaintiff does not have a "serious medical need" concerning his blood-sugar level and even if he did, Medical Defendants have responded timely and appropriately by checking Plaintiff's blood-sugar level at his request.

**6.    PLAINTIFF DOES NOT HAVE ANY VISIBLE SIGNS OF
SORES  ON HIS LEGS, HANDS, BACK, HEAD AND
FACE REQUIRING MEDICAL TREATMENT.**

Plaintiff also alleges in his Amended Complaint that, "plaintiff still seeks explanation for symptoms of outbreak of sores on legs, back hands, face and head.  Plaintiff [has] sent complaint forms to the (P.H.S.) staff and institution officials at [Bullock] and [Ventress].  Plaintiff['s] complaints have been minimized on several [occasions] and totally disregarded . . . on others." (See Amended Complaint at p. 25 of 29).  As previously discussed supra at Part II.B.7., Plaintiff does not presently have any visible signs of sores on his legs, hands, back, head and face at Ventress and did not have any visible signs of the same while at Bullock.  (See Rayapati Affidavit at ¶ 12; Floyd Affidavit at ¶ 10; Burks Affidavit at ¶ 17; Hunter Affidavit at ¶ 10; Siddiq Affidavit at ¶ 10; Robinson Affidavit at ¶ 10).

Plaintiff's only visible signs of skin irritation are on his face and neck.  (Id.).  To treat these areas of irritation, Plaintiff has been given a shaving profile, ointments and creams.  (Id.). These areas of skin irritation are not open or draining and are not susceptible to infection.  (Id.). Though Plaintiff believes that these areas of skin irritation are a result of a previously administered TB skin test, such irritation could not have been caused by the TB skin test.  (Id.). A positive reaction to a TB skin test only causes an induration (i.e., hardening of the skin), swelling or blister on the forearm where the test was administered, not skin irritation to the inmate's face, neck or other parts of the inmate's body (other than the forearm).  (Id.).

Any areas where Plaintiff may be experiencing skin irritation, namely Plaintiff's face and neck, were and are continuing to be timely and appropriately treated by the medical staff at Ventress and/or Bullock.  (Id.).  Because Plaintiff does not have any sores, particularly no sores that are susceptible to infection, Plaintiff does not have any "serious medical need."  Moreover,

Medical Defendants as well as other members of PHS's medical staff continue to treat Plaintiff's areas of skin irritation (i.e., caused by shaving) through the prescription of ointments, creams and the authorization of a shaving profile. Therefore, Plaintiff's allegation that his sores have not been treated is without merit.

> **B.**    **PLAINTIFF'S CLAIMS ARE BARRED BY THE PRISON LITIGATION REFORM ACT ("PLRA") BECAUSE PLAINTIFF FAILS TO ESTABLISH THAT HE EXHAUSTED HIS ADMINISTRATIVE REMEDIES.**

The PLRA states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such *administrative remedies as are available are exhausted*." 42 U.S.C. § 1997e(a) (emphasis added).

> **1.**    **PLAINTIFF DID NOT FILE ANY GRIEVANCES WHILE AT BULLOCK, THEREBY FAILING TO EXHAUST HIS ADMINISTRATIVE REMEDIES.**

As discussed supra at Part II.C.1., Plaintiff was notified of the grievance procedures in place at Bullock. (See Robinson Affidavit at ¶ 11). However, Plaintiff's medical records do not indicate that he filed a single "informal" or "formal" grievance while incarcerated at Bullock. By failing to utilize procedures available to him within the facility at Bullock, of which he was aware, Plaintiff clearly failed exhaust the administrative remedies available to him as required by the PLRA. As such, Plaintiff's claims are due to be dismissed.

> **2.**    **PLAINTIFF HAS FAILED TO FULLY EXHAUST GRIEVANCE PROCEDURES AND ADMINISTRATIVE REMEDIES AVAILABLE TO HIM AT VENTRESS.**

As discussed supra at Part II.C.2., Plaintiff has filed eight (8) documents while at Ventress which can only loosely be considered "grievances." (See Inmate Grievances, Inmate Request Slips, Inmate Stationary, May 12, 2005 through July 15, 2005). Plaintiff's complaints

focus primarily on his having to make a $3.00 co-pay (which all inmates are required to pay) before submitting each sick call request form and his having to wait only a few days to receive a TB skin test information sheet.  (Id.).  Plaintiff's complaints only secondarily make any reference to actual medical treatment that he was dissatisfied with and/or he alleges he failed to receive. (Id.).  Further, in his "grievances" Plaintiff expressly admits he has received medical treatment. (Id.).  Considering these factors, PHS's medical staff at Ventress was not put on appropriate notice of Plaintiff's dissatisfaction with the medical treatment he was receiving in any of the aforementioned "grievances."   Pursuant to the PLRA, Plaintiff has failed to exhaust his administrative remedies; as such, his claims are due to be dismissed.

### C.    PLAINTIFF'S CLAIMS ARE BARRED BY THE PLRA BECAUSE HE HAS FAILED TO SHOW THE EXISTENCE OF A "PHYSICAL INJURY."

The PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of *physical injury*."  42 U.S.C. § 1997e(e) (emphasis added). Plaintiff's complaints again include allegations that Medical Defendants: (1) disregarded Plaintiff's complaints, causing him to develop dementia (See Amended Complaint at 17-18 of 29); (2) altered Plaintiff's shaving profile resulting in threats from ADOC's officers (Id. at pp. 18-22 of 29); (3) disregarded Plaintiff's complaints concerning TB skin tests (Id. 22-26 of 29); (4) denied Plaintiff medical treatment on specified dates (Id. at p. 24 of 29); (5) failed to check Plaintiff's blood-sugar level (Id. at p. 24 of 29); and (6) disregarded Plaintiff's complaints of sores on his legs, hands, back, head and face (Id. at p. 25 of 29).

Of these complaints, none allege the existence of a "physical injury" as is required by the PLRA.  Pursuant to the PLRA, Plaintiff has failed to allege and/or establish that he has suffered a

"physical injury" at the hands of Medical Defendants; as such, his claims are due to be dismissed.

## VI.    <u>CONCLUSION</u>

Based on the foregoing facts and legal arguments, Medical Defendants request that this Court dismiss Plaintiff's claims because the same are frivolous, malicious and fail to state a claim upon which relief can be granted.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD WAYNE WRIGHT, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:05-CV-439-WHA-CSC |
| SYLVESTER NETTLES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ANSWER TO AMENDED COMPLAINT**

COME NOW, Defendants TAHIR SIDDIQ, MD ("Dr. Siddiq"), KATHERINE TAYLOR, LPN ("Taylor"), SAMUEL RAYAPATI, MD ("Dr. Rayapati"), NETTIE BURKS, HSA ("Burks"), CELESTE HUNTER, LPN ("Hunter") and PRISON HEALTH SERVICES, INC. ("PHS," collectively with Dr. Siddiq, Taylor, Dr. Rayapati, Burks and Hunter, the "Medical Defendants"), and for their Answer to the Amended Complaint filed by Plaintiff RICHARD WAYNE WRIGHT, SR. ("Plaintiff"), state as follows:

FACTUAL ALLEGATIONS

1.      Medical Defendants admit Plaintiff filed a lawsuit pursuant to 42 U.S.C. § 1983. Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of all remaining allegations set forth on Page 1 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

2.      Medical Defendants admit Plaintiff's claims are barred by the statute of limitations. Medical Defendants deny all remaining allegations set forth on Page 2 of 29 and demand strict proof thereof.

3.     Medical Defendants deny all allegations set forth on Pages 3 and 4 of 29 and demand strict proof thereof.

4.     Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first and second full paragraphs on Page 5 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof. Medical Defendants deny all remaining allegations set forth on Page 5 of 29 and demand strict proof thereof.

5.     Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth on Pages 6 through 11 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

6.     Medical Defendants admit Plaintiff has complained of alleged headaches. Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of all remaining allegations set forth on Pages 11 and 12 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

7.     Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth on Pages 13 and 14 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

8.     Medical Defendants admit Plaintiff was transferred from Bullock Correctional Facility ("Bullock") to Ventress Correctional Facility ("Ventress"). Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of all remaining allegations set forth on Page 15 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

9.      Medical Defendants are without knowledge or information sufficient to form a belief as to the truth of all remaining allegations set forth on Page 16 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

10.      Medical Defendants deny all allegations set forth on Pages 17 through 26 of 29; as such, the same are denied and Medical Defendants demand strict proof thereof.

<u>PRAYER FOR RELIEF</u>

11.      Medical Defendants deny each and every prayer for relief set forth on Pages 26 through 28 of 29.  Likewise, Medical Defendants state that Plaintiff is not entitled to any of the requested relief.  To the extent the Complaint makes any allegations of material fact, Medical Defendants deny such allegations and demand strict proof thereof.

**<u>AFFIRMATIVE AND OTHER DEFENSES</u>**

**<u>First Defense</u>**

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

**<u>Second Defense</u>**

Plaintiff's claims are barred by the doctrine of contributory negligence and/or last clear chance.

**<u>Third Defense</u>**

Plaintiff's claims are barred by the doctrine of assumption of risk.

**<u>Fourth Defense</u>**

Plaintiff's claims are barred by the doctrine of laches.

**<u>Fifth Defense</u>**

Plaintiff's claims are barred by the statute of limitations.

**<u>Sixth Defense</u>**

Plaintiff's claims are barred by the doctrine of waiver.

### Seventh Defense

The Court lacks subject matter jurisdiction over this dispute.

### Eighth Defense

This Court is the improper venue in which to assert this action.

### Ninth Defense

Plaintiff lacks standing to bring this action.

### Tenth Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Eleventh Defense

Plaintiff's claims are barred by the doctrine of qualified immunity.

### Twelfth Defense

Plaintiff's claims are barred by the doctrine of sovereign immunity.

### Thirteenth Defense

Plaintiff's claims are barred by the doctrine of estoppel.

### Fourteenth Defense

Plaintiff's claims are barred by the doctrine of *res judicata* and/or collateral estoppel.

### Fifteenth Defense

Plaintiff's claims are barred, in whole or in part, because of his failure to mitigate damages.

### Sixteenth Defense

Medical Defendants aver that the wrongs and damages alleged by Plaintiff were caused solely by the acts and/or omissions of person and/or entities for whom or which Medical Defendants are not responsible.

### Seventeenth Defense

Plaintiff's claims are barred because Medical Defendants did not breach any duty Defendant allegedly owed to Plaintiff.

### Eighteenth Defense

Plaintiff's claims are barred because there is no casual relationship, legal or proximate, between Medical Defendants' actions or failures to act and the Plaintiff's alleged injuries and damages.

### Nineteenth Defense

Plaintiff's claims are barred because of the existence of superseding, intervening causes.

### Twentieth Defense

Plaintiff's claims are barred because of the lack of damages suffered due to any of the alleged wrongs asserted against Medical Defendants.

### Twenty-First Defense

Plaintiff has failed to exhaust or attempt to exhaust administrative remedies.  42 U.S.C. § 1997e(a) (2005).

### Twenty-Second Defense

Plaintiff's claims are barred because the action asserted is "frivolous, malicious, and fails to state a claim upon which relief can be granted."  42 U.S.C. § 1997e(c)(1) (2005).

### Twenty-Third Defense

Plaintiff's claims are barred because no personal, physical injury has been alleged and/or suffered by Plaintiff.  42 U.S.C. § 1997e(e) (2005).

### Twenty-Fourth Defense

Plaintiff's claims are barred because the injunctive relief sought is not sufficiently narrowly drawn.  18 U.S.C. § 3626(a)(1)(A) (2005).

**Twenty-Fifth Defense**

Plaintiff's claims are barred because Medical Defendants did not act with deliberate indifference. Estelle v. Gamble, 429 U.S. 97 (1976).

**Twenty-Sixth Defense**

Plaintiff's claims are barred because of his failure to allege the existence of a serious medical condition.

**Twenty-Seventh Defense**

Plaintiff's claims are barred because he is seeking to question a medical judgment via injunctive relief.

**Twenty-Eighth Defense**

To the extent Plaintiff seeks to recover any attorneys' fees, Medical Defendants object to any and all such requests for fees that are not asserted in the Complaint or otherwise approved by court order.

**Twenty-Ninth Defense**

Plaintiff's claims for punitive damages violate PHS's United States and Alabama constitutional protections from, including without limitation, excessive fines, cruel and unusual punishment, denial of due process and denial of equal protection of the law.

**Thirtieth Defense**

Medical Defendants reserve the right to assert other defenses as discovery proceeds.

Respectfully submitted on this the 14th day of November 2005.


/s/ William R. Lunsford
One of the Attorneys for Medical Defendants

**OF COUNSEL**:

David B. Block
William R. Lunsford
BALCH & BINGHAM LLP
Post Office Box 18668
Huntsville, AL 35804-8668
Telephone: (256) 551-0171
Facsimile: (256) 512-0119

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected by email to the CM/ECF participants or by postage prepaid first class mail to the following this the 14th day of November, 2005:

Richard Wayne Plaintiff, Sr.
AIS# 187140
Ventress Correctional Facility
P.O. Box 767
Clayton, AL 36016-0767

Gregory Marion Biggs
Department of Corrections
P.O. Box 301501
301 Ripley Street
Montgomery, AL 36130

Steven Mallette Sirmon
Alabama Board of Pardons & Paroles
301 South Ripley Street
P.O. Box 302405
Montgomery, AL 36130

Hugh Davis
Alabama Board of Pardons & Paroles
P.O. Box 302405
Montgomery, AL 36130-2405

/s/ William R. Lunsford
Of Counsel