# Exhibit "C"
## Dale Robinson's Affidavit

Case 2:05-cv-00439-WHA-CSC   Document 73-4   Filed 11/14/2005   Page 1 of 9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RICHARD WAYNE WRIGHT, SR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 2:05-CV-439-A |
| ) | |
| SYLVESTER NETTLES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

### AFFIDAVIT OF DALE ROBINSON

STATE OF ALABAMA    )
                              )
COUNTY OF BULLOCK )

Before me, the undersigned Notary Public, personally appeared DALE ROBINSON who, after being duly sworn, states as follows:

1.  My name is Dale Robinson. I am over the age of nineteen (19) years and have personal knowledge of the facts set forth in this affidavit.

2.  I am a certified nurse and have been employed at Bullock Correctional Facility ("Bullock") in Union Springs, Alabama since September 13, 2004. I served as the Director of Nursing at Bullock from September 13, 2004, to December 28, 2004. I am presently employed by Prison Health Services, Inc. ("PHS") as the Health Services Administrator at Bullock.

3.  Richard Wayne Wright ("Wright") was at one time an inmate incarcerated at Bullock. Wright is not incarcerated at Bullock at this time.

4.  When an inmate has a non-emergency medical or health problem and/or complaint, an inmate may file a sick call request form in order to bring this problem or complaint to the attention of the medical staff at Bullock and/or request medical treatment for this problem.

84518.1

The sick call request process is well-known at Bullock and is utilized by inmates at Bullock on a daily basis. When an inmate first arrives at Bullock, he is taken to the Health Care Unit to be processed in the system and receive an orientation as to the availability of medical services at the facility as well as the procedures for obtaining medical care. During this orientation, the medical staff gives each inmate an information sheet and verbally goes through the sheet with newly-arriving inmates, informing them how to utilize the sick call request form process. Sick call request forms are available at the Health Care Unit or Alabama Department of Corrections ("ADOC") shift commander's office at Bullock. An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature) and submit the sick call request form by placing it in a locked box located outside the facility's health care unit. Sick call request forms are then brought to the Health Care Unit. The sick call request forms are removed from the locked box each day at approximately 12:00 p.m. and marked as received by the medical records clerk or a nurse at that time. Upon reviewing the sick call request forms, the medical staff compiles a list of inmates having submitted sick call request forms, which is then provided to correctional officers in the various dorms at Bullock who are responsible for notifying inmates in the particular dorms that sick call has begun. Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints at the time they are summoned to the Health Care Unit for sick call. The nurse conducting sick call takes reporting inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Bullock. If an inmate submits more than one (1) sick call request form on the same day, the nurse will only fill in the intake

M451K.1              2

information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan. If the inmate fails to report to sick call when summoned, this is often indicated in the sick call request form because the sick call request form is left blank, i.e. not completed, by the medical staff. If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit and the inmate will not be required to wait until sick call begins.

5. During his incarceration at Bullock, Wright was not diagnosed with and did not seek any treatment for dementia. Dementia is not a specific disease. Dementia is a descriptive term for a collection of symptoms that can be caused by a number of disorders that affect the brain. Inmates with dementia have significantly impaired intellectual functioning that interferes with normal activities and relationships. Inmates with dementia also lose their ability to solve problems and maintain emotional control and they may experience personality changes and behavioral problems, such as agitation, delusions and hallucinations. While memory loss is a common symptom of dementia, memory loss by itself does not conclusively lead to the diagnosis that a person has dementia. Physicians diagnose dementia only if two or more brain functions (such as memory and language skills) are significantly impaired without loss of consciousness. During his incarceration at Bullock, Wright did not demonstrate to me any of the impairments and/or symptoms required for a diagnosis of dementia.

6. The Alabama Department of Corrections ("ADOC") has established general rules and/or guidelines governing the terms of incarceration for inmates within the Alabama prison system. When an inmate should be allowed to deviate from a rule or guideline imposed by ADOC for medical reasons, the medical staff must provide the inmate with a document referred

to as a "profile" which permits an inmate to be excepted from the application of one of these ADOC rules and/or guidelines. ADOC has adopted certain rules regarding shaving. Shaving profiles are sometimes given to inmates at Bullock who, because of the nature of the hair on their faces or because they develop razor bumps, are not required to shave with a razor. Instead, these inmates are allowed to use clippers or are allowed not to shave and grow facial hair not exceeding one-eighth (1/8) of an inch. If an inmate wishes to request a shaving profile, he must submit a sick call request form and make a $3.00 co-pay. A nurse will then evaluate the inmate during the sick call process and refer the inmate to a nurse practitioner or physician, who are the only parties authorized to create a shaving profile for an inmate. The nurse practitioner or physician will evaluate the inmate's facial irritation and either recommend or deny a shaving profile. Physicians indicate where an inmate is allowed to have hair on his face by darkening areas on a paper drawing of a face. This paper document is visually depicts an inmate's shaving profile. When the profile is completed, the inmate is given a carbon copy of this profile to show physicians, nurses and ADOC's employees why his face is not completely shaven. A shaving profile has an effective date and expiration date. At Bullock, shaving profiles can be effective from thirty (30) days to one (1) year. If an inmate is transferred from one facility to another (i.e., such as Wright's transfer from Bullock to Ventress), a nurse may copy the shaving profile from another facility to make it effective in the new facility. Wright was not denied or refused a shaving profile at any time during his incarceration at Bullock.

7. Wright did test positive for tuberculosis ("TB") during his incarceration at Bullock. TB is an infection with the bacterium *Mycobacterium tuberculosis*, which most commonly affects the lungs, but can also affect the central nervous system, lymphatic system, circulatory system, bones and joints. There are two (2) types of TB: latent and active. Latent TB

results when an inmate is exposed to another individual with the TB virus and contracts the TB virus in its non-active state. Inmates with latent TB cannot transmit the virus to other inmates. Active TB may result when latent TB goes untreated. If an inmate is exposed to TB, he may test positive after a TB skin test (otherwise known as and/or labeled a "PPD" skin test). A TB skin test is given by needle in the inmate's forearm. After the TB skin test is administered, the inmate will return to the Health Care Unit in two (2) to three (3) days to determine if the TB skin test is positive or negative. If an inmate has been exposed to the TB virus (i.e., latent TB), the inmate will have an induration (i.e., hardening of skin), swelling or blister on the forearm where the test was given. If there is no reaction, the skin will remain smooth at the site of the test without a reaction (i.e., a zero (0) millimeters reaction as indicated on the TB skin test results). A TB skin test is given as a preventive measure to allow the medical staff at Bullock to identify those inmates who have been exposed to TB and take the necessary steps to ensure that active TB does not develop. If an inmate tests positive for TB, the inmate is given the medication isoniazid ("INH") as a preventative measure to prevent active TB from developing. An inmate having a positive TB skin test is also given a chest X-ray to determine lung abnormality. An inmate testing positive for active TB (which is contagious and can be passed from inmate-to-inmate) is also sent to a negative pressure isolation room at Kilby Correctional Facility ("Kilby") for monitoring and treatment. After the inmate undergoes the initial treatment process at Kilby, three (3) sputum cultures are taken and must come back negative in order for the inmate to return to Bullock's inmate population. A sputum culture is a diagnostic test used to detect and confirm the pretense of active TB within the lungs. A sputum culture collection involves the patient coughing deeply to expel the sputum. If the patient is unable to cough deeply enough to expel a sufficient sample, a suction tube or needle may be used to collect the sputum sample. The

sputum is coughed into or placed in a sterile container containing a substance that promotes bacterial and fungal growth. However, if no fungi or bacteria grow, the test is considered to be negative. Because Wright did not test positive for active TB, he was not transferred to Kilby for isolation, monitoring and treatment.

8. Wright received TB skin tests on April 14, 2004 (with corresponding results on April 17, 2004) and May 11, 2004 (with corresponding results on May 14, 2004), which indicated he had a zero (0) millimeter reaction to the TB skin test. This means Wright was not exposed to the TB virus and had not contracted latent or active TB.

9. During his incarceration at Bullock, the medical staff tested Wright's blood-sugar level at his request. The only inmates at Bullock who have their blood-sugar levels regularly tested are inmates who are diabetic, whose blood-sugar level require oversight by the medical staff. When the medical staff tested Wright's blood-sugar level, the results of this test placed him squarely within the normal range. Wright's lab test results taken on December 3, 2004 (reported on December 4, 2004), indicate that Wright's "Glucose, Serum" level was "76 mg/dL." The normal range limits are "65-99 mg/dL." Wright's test results fall well within this range. Wright has not been diagnosed with diabetes.

10. Wright did not have any visible signs of sores on his legs, hands, back, head and face while at Bullock. Wright's only visible signs of skin irritation were on his face and neck. To treat these areas of irritation, Wright was given a shaving profile, ointments and creams. These areas of skin irritation were not open or draining and are not susceptible to infection. Though Wright believes that these areas of skin irritation may have been the result of a previously administered TB skin test, such irritation could not have been caused by the TB skin test. A positive reaction to a TB skin test only causes a red spot, rash, swelling or blister on the

forearm where the test was administered, not skin irritation to the inmate's face, neck or other parts of the inmate's body (other than the forearm). Any areas where Wright may have been experiencing skin irritation, namely Wright's face and neck, were timely and appropriately treated by the medical staff at Bullock.

11. PHS has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at Bullock. The existence of the grievance procedure is well-known among the prison population at Bullock, as indicated by the fact that numerous informal and/or formal grievances are received on a regular basis. The grievance process consists of two steps. In order to initiate the grievance process, an inmate must submit an "informal" grievance, describing his complaint or complaints about medical treatment he has sought or received at Bullock. Within five (5) days of submission of an informal grievance, the medical staff at Bullock will provide a response to this grievance. If an inmate is displeased or not satisfied with the response to his informal grievance, he may submit a "formal" grievance, explaining why the inmate is displeased or not satisfied with the response provided by the medical staff. The medical staff will provide a response to any grievance submission within five (5) days. Informal and formal grievance forms are available to all inmates and may be obtained from me directly or from the Health Care Unit shift commander's station, which is located within the Health Care Unit at Bullock and is readily accessible to all inmates throughout the day. Inmates are instructed to place completed grievance forms in the locked, brown box located in the Health Care Unit. Prior to 12:00 p.m. every day, a medical records clerk opens the locked brown box, retrieves any grievances contained in the box and provides any grievances to me. I review the grievances at least once a week, provide my written response at the bottom of the form and return a copy of the

completed grievance form to the inmate. An additional copy of the completed grievance is placed in the inmate's medical records file. I encourage inmates who have complaints about the medical care they have sought or received at Bullock to utilize this grievance process.

12. PHS's physicians, nurse practitioners, nurses and other medical personnel at Bullock are not responsible for actions taken by ADOC officers and/or other personnel. Particularly, PHS's physicians, nurse practitioners, nurses and other medical personnel at Bullock do not engage in the following activities: intercepting any inmate's outgoing mail, falsely accusing any inmate of violating any administrative rule, falsely altering the crimes for which an inmate has been incarcerated (thereby hindering the inmate's parole), raising any inmate's security status from minimum to maximum, falsifying statements made by any inmate or harassing any inmate.

13. PHS's physicians, nurse practitioners, nurses and other medical personnel at Bullock responded in a timely and appropriate manner to the requests for medical treatment submitted by Wright during his incarceration. The medical staff at Bullock did not ignore any of Wright's medical complaints or refuse in any way to provide him with any necessary medical treatment. On each occasion that Wright made medical complaints, the medical staff provided Wright with timely and appropriate medical care and treatment for his problems.

Further affiant saith not.

_____
Dale Robinson

SWORN TO and SUBSCRIBED before this the 14 day of November, 2005

_____
Notary Public
My Commission Expires: 6-7-2006

(SEAL)

8