# Exhibit "D"
Dr. Samuel Rayapati's Affidavit

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RICHARD WAYNE WRIGHT, SR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 2:05-CV-439-A |
| ) | |
| SYLVESTER NETTLES, et al., ) | |
| ) | |
| Defendants. ) | |

**AFFIDAVIT OF SAMUEL RAYAPATI, M.D.**

**STATE OF ALABAMA** )
)
**COUNTY OF BARBOUR** )

Before me, the undersigned Notary Public, personally appeared SAMUEL RAYAPATI, M.D., who after being duly sworn, states as follows:

1. My name is Samuel Rayapati. I am over the age of nineteen (19) years and have personal knowledge of the information contained in this affidavit.

2. I am a licensed physician in the state of Alabama. I have been employed by Prison Health Services ("PHS") as the Medical Director at Ventress Correctional Facility ("Ventress") since February, 2004.

3. Richard Wayne Wright ("Wright") is an inmate currently incarcerated a Ventress. Wright was transferred from Bullock Correctional Facility to Ventress on or about March 3, 2005.

4. When an inmate has a non-emergency medical or health problem and/or complaint, an inmate may file a sick call request form in order to bring this problem or complaint

84557.2

to the attention of the medical staff at Ventress and/or request medical treatment for this problem. The sick call request process is well-known at Ventress and is utilized by inmates at Ventress on a daily basis. When an inmate first arrives at Ventress, he is taken to the Health Care Unit to be processed in the system and receive an orientation as to the availability of medical services at the facility as well as the procedures for obtaining medical care. During this orientation, the medical staff gives each inmate an information sheet and verbally goes through the sheet with newly-arriving inmates, informing them how to utilize the sick call request form process. Sick call request forms are available at the Health Care Unit or Alabama Department of Corrections ("ADOC") shift commander's office at Ventress. An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature) and submit the sick call request form by placing it in a locked box located in the facility's kitchen. Sick call request forms are then brought to the Health Care Unit. The sick call request forms are removed from the locked box each day at approximately 12:00 p.m. and marked as received by the medical records clerk or a nurse at that time. Upon reviewing the sick call request forms, the medical staff compiles a list of inmates having submitted sick call request forms, which is then provided to correctional officers in the various dorms at Ventress who are responsible for notifying inmates in the particular dorms that sick call has begun. Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints at the time they are summoned to the Health Care Unit for sick call. The nurse conducting sick call takes reporting inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Ventress. If an inmate submits more

than one (1) sick call request form on the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan. If the inmate fails to report to sick call when summoned, this is often indicated in the sick call request form because the sick call request form is left blank, i.e. not completed, by the medical staff. If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit and the inmate will not be required to wait until sick call begins.

    5.    During his incarceration at Ventress, Wright was not diagnosed with and has not sought any treatment for dementia. Dementia is not a specific disease. Dementia is a descriptive term for a collection of symptoms that can be caused by a number of disorders that affect the brain. Inmates with dementia have significantly impaired intellectual functioning that interferes with normal activities and relationships. Inmates with dementia also lose their ability to solve problems and maintain emotional control and they may experience personality changes and behavioral problems, such as agitation, delusions and hallucinations. While memory loss is a common symptom of dementia, memory loss by itself does not conclusively lead to the diagnosis that a person has dementia. Physicians diagnose dementia only if two or more brain functions (such as memory and language skills) are significantly impaired without loss of consciousness. During his incarceration at Ventress, Wright has not demonstrated to me any of the impairments and/or symptoms required for a diagnosis of dementia.

    6.    The Alabama Department of Corrections ("ADOC") has established general rules and/or guidelines governing the terms of incarceration for inmates within the Alabama prison system. When an inmate should be allowed to deviate from a rule or guideline imposed by

84557.2

3

ADOC for medical reasons, the medical staff must provide the inmate with a document referred to as a "profile" which permits an inmate to be excepted from the application of one of these ADOC rules and/or guidelines. ADOC has adopted certain rules regarding shaving. Shaving profiles are sometimes given to inmates at Ventress who, because of the nature of the hair on their faces or because they develop razor bumps, are not required to shave with a razor. Instead, these inmates are allowed to use clippers or are allowed not to shave and grow facial hair not exceeding one-eighth (1/8) of an inch. If an inmate wishes to request a shaving profile, he must submit a sick call request form and make a $3.00 co-pay. A nurse will then evaluate the inmate during the sick call process and refer the inmate to a nurse practitioner or physician, who are the only parties authorized to create a shaving profile for an inmate. The nurse practitioner or physician will evaluate the inmate's facial irritation and either recommend or deny a shaving profile. Physicians indicate where an inmate is allowed to have hair on his face by darkening areas on a paper drawing of a face. This paper document is visually depicts an inmate's shaving profile. When the profile is completed, the inmate is given a carbon copy of this profile to show physicians, nurses and ADOC's employees why his face is not completely shaven. A shaving profile has an effective date and expiration date. At Ventress, shaving profiles can be effective from thirty (30) days to one (1) year. If an inmate is transferred from one facility to another (i.e., such as Wright's transfer from Bullock to Ventress), a nurse may copy the shaving profile from another facility to make it effective in the new facility. When Wright transferred from Bullock to Ventress, a member of the medical staff copied Wright's shaving profile, which was provided to him at Bullock. Wright currently has a shaving profile that does not expire until May 5, 2006. Wright has not been denied or refused a shaving profile at any time during his incarceration at Ventress.

7.     Wright has not tested positive for tuberculosis ("TB") during his incarceration at Ventress. TB is an infection with the bacterium *Mycobacterium tuberculosis*, which most commonly affects the lungs, but can also affect the central nervous system, lymphatic system, circulatory system, bones and joints. There are two (2) types of TB: latent and active. Latent TB results when an inmate is exposed to another individual with the TB virus and contracts the TB virus in its non-active state. Inmates with latent TB cannot transmit the virus to other inmates. Active TB may result when latent TB goes untreated. If an inmate is exposed to TB, he may test positive after a TB skin test (otherwise known as and/or labeled a "PPD" skin test). A TB skin test is given by needle in the inmate's forearm. After the TB skin test is administered, the inmate will return to the Health Care Unit in two (2) to three (3) days to determine if the TB skin test is positive or negative. If an inmate has been exposed to the TB virus (i.e., latent TB), the inmate will have an induration (i.e., hardening of skin), swelling or blister on the forearm where the test was given. If there is no reaction, the skin will remain smooth at the site of the test without a reaction (i.e., a zero (0) millimeters reaction as indicated on the TB skin test results). A TB skin test is given as a preventive measure to allow the medical staff at Ventress to identify those inmates who have been exposed to TB and take the necessary steps to ensure that active TB does not develop. If an inmate tests positive for TB, the inmate is given the medication isoniazid ("INH") as a preventative measure to prevent active TB from developing. An inmate having a positive TB skin test is also given a chest X-ray to determine lung abnormality. An inmate testing positive for active TB (which is contagious and can be passed from inmate-to-inmate) is also sent to a negative pressure isolation room at Kilby Correctional Facility ("Kilby") for monitoring and treatment. After the inmate undergoes the initial treatment process at Kilby, three (3) sputum cultures are taken and must come back negative in order for the inmate to return

to Ventress's inmate population. A sputum culture is a diagnostic test used to detect and confirm the pretense of active TB within the lungs. A sputum culture collection involves the patient coughing deeply to expel the sputum. If the patient is unable to cough deeply enough to expel a sufficient sample, a suction tube or needle may be used to collect the sputum sample. The sputum is coughed into or placed in a sterile container containing a substance that promotes bacterial and fungal growth. However, if no fungi or bacteria grow, the test is considered to be negative. Because Wright did not test positive for active TB, he was not transferred to Kilby for isolation, monitoring and treatment.

8. Wright received TB skin tests on April 14, 2004 (with corresponding results on April 17, 2004) and May 11, 2004 (with corresponding results on May 14, 2004), which indicated he had a zero (0) millimeter reaction to the TB skin test. This means Wright was not exposed to the TB virus and had not contracted latent or active TB. Wright refused to take another TB skin test on April 26, 2005. As a result, Wright was placed in segregation, as a safety precaution, beginning on April 28, 2005. Wright later agreed to take the TB skin test on June 24, 2005, while he remained in segregation. After his test results were received, Wright was released from segregation on June 30, 2005. According to existing policy, Wright was not released from segregation until the medical staff confirmed he had not contracted TB.

9. After receiving negative results from his TB skin test, Wright continued to assert constant complaints regarding his opinion that he had contracted active TB. In addition to his complaints about active TB, Wright made constant complaints during his incarceration at Ventress regarding various other ailments including: rashes, scabs on his legs, itching, sinus problems, joint popping and stiffness and headaches. Though I have seen, evaluated and treated Wright for each of these complaints, I have continually noted in his medical records and believe

he is malingering (i.e., creating medical problems that do not exist based upon my examinations and observations). Malingering is a deliberate behavior for a known, external purpose. It is not considered a form of mental illness or psychopathology in and of itself, although it can and does occur in the context of other mental illnesses. Malingering can be expressed in several forms ranging from pure malingering, in which the individual falsifies all symptoms, to partial malingering, in which the individual has symptoms but exaggerates the impact which they have upon daily functioning. An individual may be motivated to engage in malingering in order to receive financial gain (at present or at some future time), to get time off work, to receive sympathy or for any number of other reasons. Because Wright continually engaged in malingering, many times submitting multiple sick call requests on the same day for alleged ailments for which there were no physical signs, I referred him to Mental Health for a psychiatric evaluation, counseling and reality test in order to assure Wright understood that he should not create or falsify his past, present or future medical history, current problems and/or other ailments. It is well-known in the medical field that people who malinger rarely accept psychiatric referral. However, in Wright's case, I wanted to ensure and/or verify that his malingering did not stem from an underlying mental illness such hypochondria, severe depression or another anxiety disorder.

10. Based on my medical judgment, Wright's real, non-feigned health problems include: facial skin irritation (which poses no serious health threat), sinus problems (which are currently being treated) and headaches (which stem from vision problems for which Wright has been prescribed corrective glasses).

11. During his incarceration at Ventress, the medical staff has tested Wright's blood-sugar level at his request. The only inmates at Ventress who have their blood-sugar levels

regularly tested are inmates who are diabetic, whose blood-sugar level require oversight by the medical staff. When the medical staff tested Wright's blood-sugar level, the results of this test placed him squarely within the normal range. Wright's lab test results taken on December 3, 2004 (reported on December 4, 2004), indicate that Wright's "Glucose, Serum" level was "76 mg/dL." The normal range limits are "65-99 mg/dL." Wright's test results fall well within this range. Wright has not been diagnosed with diabetes.

12. Wright does not have any visible signs of sores on his legs, hands, back, head and face. Wright's only visible signs of skin irritation are on his face and neck. To treat these areas of irritation, Wright has been given a shaving profile, ointments and creams. These areas of skin irritation are not open or draining and are not susceptible to infection. Though Wright believes that these areas of skin irritation are a result of a previously administered TB skin test, such irritation could not have been caused by the TB skin test. A positive reaction to a TB skin test only causes a red spot, rash, swelling or blister on the forearm where the test was administered, not skin irritation to the inmate's face, neck or other parts of the inmate's body (other than the forearm). Any areas where Wright may be experiencing skin irritation, namely Wright's face and neck, have been and are continuing to be timely and appropriately treated by the medical staff at Ventress.

13. Though Wright continues to malinger and otherwise falsify or exaggerate health problems, Wright continues to receive and has never been denied the right to be evaluated by PHS's nurses, physicians and other medical personnel. PHS's physicians, nurse practitioners, nurses and other medical personnel at Ventress have responded in a timely and appropriate manner to the requests for medical treatment submitted by Wright during his incarceration. The medical staff at Ventress has not ignored any of Wright's medical complaints or refused in any

way to provide him with any necessary medical treatment. On each occasion that Wright has made medical complaints, the medical staff has provided Wright with timely and appropriate medical care and treatment for his problems.

Further affiant saith not.

_____
Samuel Rayapati, M.D.

SWORN TO and SUBSCRIBED before this the 11th day of November, 2005

_____
Notary Public
My Commission Expires: My Commission Expires August 21, 2007

(SEAL)

84557.2    9